UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CORNELIUS MARTIN, II,

                              Plaintiff,

              -vs-                                      05-CV-868(JTC)

THE NIAGARA COUNTY JAIL, et al,,

                              Defendants.
_____

APPEARANCES:    CORNELIUS MARTIN, II, Plaintiff *Pro Se.*

                WEBSTER SZANYI, LLP (CHARLES E. GRANEY, ESQ. and
                MARK C. DAVIS, ESQ., OF COUNSEL), Buffalo, New York,
                Attorneys for Defendants Niagara County Jail, Beilein, Mahar,
                Drehs, and Woock.

                ROACH, BROWN, McCARTHY & GRUBER, P.C. (JOEL J. JAVA,
                JR., ESQ., OF COUNSEL), Buffalo, New York Attorneys, for
                Defendants Hohensee, Aikin, and Inter-Community Memorial
                Hospital.


## INTRODUCTION

Plaintiff brought this action pursuant to 42 U.S.C. § 1983 seeking compensatory and

punitive damages for the alleged deliberate indifference to his serious medical needs and

the deprivation of medical care.  Currently pending before the court are the defendants'

motions for summary judgment (Items 59, 60) and plaintiff's cross-motion for summary

judgment on liability (Item 62).

## BACKGROUND

Plaintiff commenced this action on December 12, 2005 with the filing of a *pro se*

complaint pursuant to Title 42 U.S.C. § 1983 (Item 1).  He filed an amended complaint on

March 30, 2006 (Item 6).  Plaintiff seeks injunctive relief and compensatory and punitive damages for the alleged deliberate indifference to his medical needs in violation of his rights under the Eighth Amendment to the United States Constitution.

Answers to the amended complaint were filed on November 13, 2006, by defendants Mahar, Drehs, Woock, Niagara County Jail, and Beilein ("the County defendants") (Item 18), and on November 15, 2006 by defendants Hohensee, Aikin, and Inter-Community Memorial Hospital ("the medical defendants") (Item 22).  Plaintiff's deposition was taken on September 4, 2008.  Following the deposition, the parties stipulated to the following: 1) plaintiff agreed to withdraw his claims against the defendants based on excessive dust, regarding his treatment for sinus problems, and arising from his lack of a mattress and pillow for 12 hours; 2) plaintiff agreed to withdraw his claims against defendants Drehs and Woock individually; 3) all issues regarding plaintiff's CPAP machine were resolved; and 4) plaintiff acknowledged that his claim that he did not receive an inmate handbook did not constitute a violation of the Eighth Amendment (Item 53).

Pursuant to a case management order and following the parties' exchange of discovery materials, on August 27, 2009, the medical defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56 (Item 59).  On August 28, 2009, the County defendants filed a motion for summary judgment (Item 60).  Defendants assert the following grounds for summary judgment: 1) the plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act of 1995; 2) Inter-Community Memorial Hospital cannot be held liable on the basis of *respondeat superior;* 3) there was no deliberate indifference to plaintiff's medical needs; 4) defendants are entitled to qualified

immunity; and 5) plaintiff's claims against Sheriff Beilein must be dismissed as they are based on a policy that does not exist.

Plaintiff filed his cross-motion for summary judgment on August 31, 2009 (Item 62). He asserted that administrative remedies were unavailable to him as he never received an inmate handbook at the Niagara County Jail. Plaintiff also argued that he suffers from a serious medical need and that the interference by the defendants with his ongoing medical treatment constituted deliberate indifference.

On October 30, 2009, defendants filed responses in opposition to plaintiff's motion for summary judgment (Items 66, 67). Plaintiff filed a response to defendant's motions on November 5, 2009 and agreed to withdraw his claim against Inter-Community Memorial Hospital (Item 68, p. 3). Thereafter, on January 27, 2010, the medical defendants filed a reply (Item 70), and the County defendants filed a reply on January 29, 2010 (Item 71).

The court has determined that oral argument is unnecessary. For the reasons that follow, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

## FACTS[1]

Plaintiff was incarcerated at the Niagara County Jail ("NCJ") from May 11, 2005 through July 5, 2005, and again from October 7, 2005 until February 3, 2006. At the time he entered the jail, he had been undergoing treatment following multiple spinal surgeries

---

[1] This factual statement is taken from the plaintiff's medical and grievance records (Item 59, Exhs. G, J - M), the plaintiff's deposition testimony (Item 59, Exh. H), the affidavits of James Hohensee, M.D., Christopher Aikin, N.P. and Paul Adler, D.O., with exhibits (Item 59, atts. 17 - 21), and the affidavits of Rebecca Mahar, Duane Vendetta, and John T. Saxton (Item 60, atts. 6-8) .

which consisted of physical therapy; two 80 milligram time-released oxycontin pills, one taken at night and one in the morning; and five milligram oxycodone pills to be taken in combination with aspirin or tylenol for breakthrough pain (Item 59, Exh. H, "Martin Dep.," p. 20). Plaintiff stated that while he was not addicted to oxycontin, he was physically "dependent" on the medication. *Id.,* p. 34.

At the time he was booked into the NCJ on May 11, 2005, plaintiff was evaluated by defendant Mahar, a nurse employed by the NCJ. She noted a diagnosis of diabetes and sleep apnea and a prior history of spinal surgery (Item 60, Att. 6, "Mahar Aff.," Exh. A). Nurse Mahar contacted defendant Aikin, the nurse practitioner for the NCJ, who issued a telephone order for plaintiff to be started on the facility's diabetes and detoxification protocols. *Id.,* ¶¶ 14-15. According to the signed standing medical orders of the detox protocol, Nurse Mahar gave plaintiff one tablet of darvocet on the evening of May 11, 2005. *Id.,* ¶ 16.

As a result of being on the detox protocol, plaintiff was housed in an area of the NCJ that he described as "squalor" (Martin Dep., pp. 51, 97). On May 13, 2005, plaintiff asked to be removed from the detox program so that he could be moved to more suitable housing for federal prisoners. *Id.,* p. 98. As a result of being denied oxycontin, plaintiff testified that he suffered sweats, tremors, extremely high blood pressure, diarrhea, and pain in his extremities which lasted about a week to ten days. *Id.,* p. 41, 42. Other than extremity pain, the withdrawal symptoms plaintiff experienced as a result of the detox protocol have all resolved. *Id.,* p. 47. While housed at the NCJ, plaintiff was also prescribed Ultram for

4

pain, nasal spray for rhinitis, Imodium for diarrhea, and blood pressure medication for hypertension. *Id.,* pp. 44, 54, 106-07.

Prior to his admission to the NJC, plaintiff had not spent a significant amount of time in custody in a New York State jail or prison.  He spent 14 days at the Erie County Medical Center awaiting extradition to Ohio in 1995, and approximately one hour in Fredonia awaiting bail in 1990 (Martin Dep., pp. 61-62).  He was not familiar with the grievance process and had never filed a grievance. *Id.,* pp. 62-63.  Plaintiff stated that he learned of the grievance process in December 2005 or January 2006 by reading the New York State "Minimum Standards" binder in the facility law library. *Id.,* pp. 65, 86.

During the intake process, plaintiff signed a form acknowledging receipt of a inmate handbook, although he denies receiving the handbook either time he was processed. Plaintiff stated that he simply signed the acknowledgment because he was told to do so by the admitting officer (Martin Dep., pp. 80, 84-85).  He filed a grievance related to his Eighth Amendment claim on January 2, 2006 and pursued the grievance through the appeals process. *Id.,* pp. 71-72.

In support of the motion for summary judgment, defendants submitted an affidavit of Captain Duane Vendetta, grievance coordinator for the Niagara County Sheriff's Department (Item 60, att. 7).  The grievance policy in effect at the time plaintiff was incarcerated provided that inmates must complete and submit a grievance form within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9.  If the inmate is dissatisfied with the decision of the grievance coordinator, he can appeal to the Chief Administrative Officer of the facility. *Id.,* ¶ 10.  After receiving a response from the Chief

Administrative Officer, the inmate could seek review of the decision with the Citizen's Policy and Complaint Review Council ("CPCRC") of the New York State Commission of Correction.  *Id.,* ¶ 11.  Capt. Vendetta stated he reviewed the grievance file for the time period that plaintiff was incarcerated at the NCJ and found no grievances filed by the plaintiff until January 3, 2006 and January 13, 2006.  *Id.,* ¶¶ 15-16.  Additionally, Capt. Vendetta stated that it is standard practice for all incoming inmates to receive an inmate handbook that outlines the grievance process.  *Id.,* ¶ 24.  Even if plaintiff did not receive a handbook, the grievance process is outlined in reference books available in the NCJ law library.  *Id.,* ¶ 25.  All officers in the housing units are familiar with the grievance process and are instructed to provide grievance forms to any inmate wishing to report a problem. *Id.,* ¶ 26.

In further support of the motion for summary judgment, Dr. James Hohensee stated that at the NCJ, the use of narcotics for pain control is strictly scrutinized (Item 59, att. 17, ¶ 14).  In a correctional facility, there is a preference for non-narcotic pain management, if medically possible, but narcotics are prescribed in some cases.  *Id.,* ¶ 15.  The detoxification protocol at the NCJ in 2005 consisted of a set of standing orders.  *Id.,* ¶ 17. The order to place plaintiff on the detox protocol was given by Nurse Practitioner Christopher Aikin and carried out by Rebecca Mahar, a jail nurse.  *Id.,* ¶ 18.  Thereafter, Dr. Hohensee reviewed plaintiff's chart and countersigned the detox order.  *Id.,* ¶ 19.  Dr. Hohensee saw plaintiff on June 28, 2005 for a scheduled follow-up visit.   Plaintiff complained that the Ultracet he was prescribed was not helping his pain and that he had swelling in his legs.  *Id.,* ¶ 22.  Dr. Hohensee did not believe narcotics were clinically

warranted and chose to add 600 mg. of Motrin to be given three times per day. *Id., ¶*23.
On December 2, 2005, Dr. Hohensee saw plaintiff for sinus complaints. *Id., ¶* 25.   Dr.
Hohensee saw plaintiff on December 30, 2006 for complaints of knee pain.  He saw no
evidence of acute injury and did not feel additional medication was necessary. *Id., ¶* 28.
Dr. Hohensee saw plaintiff for the last time on January 27, 2006.  Plaintiff complained of
nosebleeds associated with his use of a CPAP machine. *Id., ¶* 27.

In his affidavit, Christopher Aikin stated that he practices medicine at the NCJ in
collaboration with Dr. Hohensee.   As a licensed nurse practitioner, he may examine
patients, write prescriptions, and order tests (Item 59, att. 18, ¶ 8).  On May 11, plaintiff
was booked at the NCJ and was evaluated by Rebecca Mahar, R.N. *Id., ¶* 14.  At NJC,
narcotic medications are strictly regulated, although there is no blanket prohibition against
their use when medically necessary. *Id., ¶* 17.  Mr. Aikin examined plaintiff on May 12,
2005.   He confirmed that plaintiff was appropriately on the detox protocol, requested
plaintiff's medical records from his neurosurgeon, and determined that narcotic pain
medication was not medically necessary. *Id., ¶* 19.   On May 13, 2005, plaintiff denied
detox symptoms, told Mr. Aikin that he had taken only dose of oxycontin in the last 14
days, and requested to be removed from the detox protocol. *Id., ¶* 21.  On May 16, 2005,
Mr. Aikin ordered Zestril for plaintiff's hypertension. *Id., ¶* 23.  On May 19, 2005, Mr. Aikin
saw plaintiff again, discontinued the Zestril, ordered Imodium for gastrointestinal
complaints, and prescribed Ultracet for pain. *Id., ¶* 25.   On June 3, 2005, Mr. Aikin
increased the dosage of Ultracet. *Id., ¶* 27.  On June 14, 2005, Mr. Aikin saw plaintiff, who
complained of constipation.  Mr. Aikin ordered magnesium citrate and advised plaintiff to

increase his fruit and vegetable intake. *Id.,* ¶ 28. Upon his return to the NCJ in October 2005, plaintiff had lost 75 pounds, no longer needed blood pressure medication, and was taking only Ibuprofen for pain. *Id.,* ¶¶ 31-33. He was seen by Mr. Aikin on October 12, 2005 for treatment of a sebaceous cyst and for sinus problems. *Id.,* ¶ 34. He was seen again on November 15, 2005 for sinus complaints, at which time Mr. Aikin prescribed a different allergy medication. *Id.,* ¶ 35. On December 16, 2006, plaintiff was seen by Mr. Aikin, complaining of knee pain. Mr. Aikin tested the knee for ligament tears and ordered x-rays. *Id.,* ¶ 38. The last time Mr. Aikin saw the plaintiff was on January 6, 2006 for a follow-up visit regarding his knee. The x-ray was negative for fracture but indicated osteoarthritis. *Id.,* ¶ 41. During plaintiff's second incarceration, he never presented in sick call for complaints related to neck or back pain. *Id.,* ¶ 42.

Dr. Paul Adler reviewed plaintiff's records from the NCJ, the Federal Bureau of Prisons, and the Northeast Ohio Correctional Center, the amended complaint, plaintiff's responses to interrogatories, and his deposition testimony. He stated that "it is well within the standard of care for nurse practitioners to see and treat patients with the plaintiff's medical issues both in and out of a correctional setting." (Adler Aff., ¶ 13). It is also standard practice in the hospital or correctional setting for a nurse to execute a telephone order from a physician or nurse practitioner. *Id.,* ¶ 16. Dr. Adler stated that Mr. Aikin's initial examination of plaintiff on May 12, 2005 was consistent with the standard of care and his order to begin detoxification was "within good medical judgment." *Id.,* ¶ 20. During plaintiff's initial incarceration at NCJ, defendants Aikin and Hohensee evaluated and addressed plaintiff's various medical issues, changing and/or increasing his pain

medication as needed. *Id.,* ¶ 33. Additionally, during his subsequent incarceration at NCJ, plaintiff's complaint regarding knee pain was appropriately evaluated. *Id.,* ¶¶ 43, 47, 49.

Dr. Adler stated that detoxification in correctional facilities is a "standard intervention," and the "decision of whether to prescribe narcotic versus non-narcotic pain relief is in the judgment of the prescribing physician." (Adler Aff., ¶ 52). The plaintiff was seen in sick call 14 times during the less-than six months he was housed at the NCJ, and was seen and treated for various reasons, including detoxification, pain, edema, hypertension, diabetes, sleep apnea, rhinitis, and knee pain. *Id.,* ¶ 56. In Dr. Adler's opinion, the medical care rendered to plaintiff by defendants Hohensee and Aikin "reflects not deliberate indifference, but clearly health care that is consistent with the applicable standard of care." *Id.,* ¶ 57.

In her affidavit, defendant Mahar stated that she followed medical orders provided to her by the Chief Medical Officer or the nurse practitioner. She never deviated from these orders and merely dispensed medication that had been prescribed by authorized medical providers (Mahar Aff., ¶¶ 19-20).

Major John T. Saxton, chief administrative officer of the NCJ, stated in an affidavit that the NCJ does not have, nor did it have at any time relevant to this litigation, a blanket prohibition preventing the Chief Medical Officer, Dr. James Hohensee, or Nurse Practitioner Aikin from prescribing narcotic pain medication in appropriate circumstances (Item 60, att. 8, ¶ 6). It is the policy of the NCJ to provide narcotic pain medication "when and if such medication is medically necessary." *Id.,* ¶ 7.

9

**DISCUSSION**

**1.     Summary Judgment Standard**

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged.  *See, e.g., Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011).   Under those standards, the party seeking summary judgment bears the initial burden of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 Fed.Appx. 387 (2d Cir. 2011).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed  . . . ." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011).  In considering whether these

10

respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that "*pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord*, 2006 WL 2794421, at *3 (W.D.N.Y. Aug. 1, 2006), *aff'd*, 2008 WL 5083122 (2d Cir. 2008) (quoting *Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998)); *see also McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, 1999 WL 983876, at *3 (S.D.N.Y. October 28, 1999) (citing cases).

The defendants contend that summary judgment should be granted dismissing the complaint as plaintiff failed to exhaust his administrative remedies in accordance with the grievance procedures in place at the NCJ.  Additionally, they argue that plaintiff has not shown deliberate indifference to his medical needs.  Plaintiff contends that administrative remedies were unavailable to him as he was unaware of the grievance procedures at the NCJ and was never given an inmate handbook.  He also argues that the defendants violated the Eighth Amendment by interfering with his ongoing treatment for pain related

to his spinal surgeries, by denying him narcotic pain medication, and by providing medical evaluation and treatment by a registered nurse and nurse practitioner.

## 2.    Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Smart v. Goord*, 441 F. Supp. 2d 631, 636 (S.D.N.Y. 2006) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Failure to exhaust is an absolute bar to an inmate's action in federal court; section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002).

In assessing the affirmative defense of non-exhaustion, the Second Circuit employs a three-part inquiry. *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). A court must (1) determine whether administrative remedies were in fact "available" to the prisoner; (2) consider whether the defendant has forfeited the affirmative defense of non-exhaustion or is estopped from raising it; and (3) determine whether "special circumstances" justify the

12

prisoner's failure to comply with administrative procedural requirements. *Id.* "Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal" in assessing availability. *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003).

In New York, formal exhaustion for prisoners in county jails requires compliance with the three-step grievance and appeal procedure outlined in the New York State Minimum Standards for Management of County Jails. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("9 N.Y.C.R.R."), § 7032.1. In this case, the NCJ employed a three-tiered grievance process with review of an inmate's complaint by the grievance coordinator, the Chief Administrative Officer of the facility, and finally the New York State Commission of Correction. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche*, 2006 WL 2309592, at *7 (S.D.N.Y. August 10, 2006) (citing cases).

Here, as stated by Capt. Vendetta, there was a grievance procedure in place at the NJC that was available to plaintiff (Item 60, att. 7, ¶ 5). Pursuant to this policy, an inmate must complete and submit a grievance within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. Capt. Vendetta stated he reviewed the grievance file for the relevant time period and found no formal grievances filed by the plaintiff between May 11 and July 5, 2005, the dates of his initial incarceration at the NCJ. *Id.,* ¶ 16. On January 3, 2006, plaintiff filed a grievance claiming that the NCJ seized oxycontin and oxycodone upon his initial admission to the NJC and that he was unlawfully placed on the detox protocol in May 2005. *Id.,* ¶ 17. Capt. Vendetta stated that this grievance was untimely,

as it referenced events that occurred significantly more than five days prior to its filing. Despite the untimeliness, the grievance was processed through the system. *Id.,* ¶ 20.

Plaintiff contends that he did not file a timely grievance because he was unaware of the grievance procedure and was never issued an inmate handbook upon his admission to the NJC. Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Murrary v. Palmer,* 2010 WL 1235591, at *5 (N.D.N.Y. March 31, 2010); *Hargrove v. Riley*, 2007 WL 389003, at *8 (E.D.N.Y. January 31, 2007). Here, there is no dispute that plaintiff had not spent a significant amount of time in custody in New York State. While he signed an intake form acknowledging his receipt of an inmate handbook on both of his admissions to the NCJ, plaintiff stated that he signed the form without reading it and because he was told to do so by the admitting officer. He was unaware of the grievance policies and procedures until approximately December 2005, when he read the grievance policy in the law library. Construing the facts in the light most favorable to plaintiff, he has raised a material fact as to whether a similarly situated person would have been unaware of the grievance process, rendering it unavailable. *See Brown v. Fischer,* 2010 WL 5797359 (N.D.N.Y. December 8, 2010) (failure to exhaust administrative remedies was excusable where inmate was unaware of the grievance procedures and there was no evidence he received an inmate handbook). Accordingly, the defendants' motions for summary judgment based on the plaintiff's failure to exhaust administrative remedies are denied.

14

3.    **Constitutional Claims**

Even excusing plaintiff's failure to exhaust his administrative remedies, the

complaint must nonetheless be dismissed as plaintiff has failed to establish a violation of

the Eighth Amendment.

Title 42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "In order to maintain a section 1983 action, two essential elements must

be present: (1) the conduct complained of must have been committed by a person acting

under color of state law; and (2) the conduct complained of must have deprived a person

of rights, privileges, or immunities secured by the Constitution or laws of the United States."

*Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994); *see also Kasiem v. Guzman*, 2011 WL

4352387, at *3 (W.D.N.Y. September 16, 2011).

 "The Eighth Amendment's prohibition against cruel and unusual punishment has

been construed to include the denial of adequate medical care for an inmate's serious

medical needs."  *Woods v. Goord*, 2002 WL 31296325, *2 (S.D.N.Y. October 10, 2002);

*see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97,

104 (1976).  The care provided to prisoners to treat their injuries or illnesses must meet

minimum medical standards of adequacy and be reasonably intended to satisfy their

medical needs.  To show that prison medical treatment was so inadequate as to amount

15

to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. at 106; *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).

Under 42 U.S.C. § 1983, every claim for deliberate indifference to a serious medical need must pass a two-pronged test consisting of objective and subjective elements.  First, the court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is "sufficiently serious." *Woods*, 2002 WL 31296325, at *3 (citing *Hathaway v. Coughlin*, 37 F.3d 63, 66–67 (2d Cir.1994)); *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Second, the court must consider whether the official "'knew that an inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate it.'" *Woods* 2002 WL 31296325 at *3 (internal cites and alterations omitted); *Harrison v. Barkley*, 219 F.3d at 137.

A serious medical need is one with some urgency or one which, if ignored, may produce death, degeneration, or extreme pain.  *Hathaway,* 37 F.3d at 66.  As the Second Circuit held in *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003), there is no precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific facts of each case.  *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). In *Chance v. Armstrong*,143 F.3d 698, 702 (2d Cir. 1998), the court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is serious.  These factors include: (1) whether a reasonable doctor or patient

16

would perceive the medical need in question as "important and worthy of comment or treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

Plaintiff's medical conditions included pain as a result of previous spinal surgeries, edema from a blood pressure medication, and knee pain. He acknowledges that the defendants adequately responded to his complaints of allergic rhinitis and sleep apnea. Edema and knee pain are not sufficiently serious to cause death, degeneration, or extreme pain. Accordingly, the plaintiff's only medical conditions that are arguably "serious" relate to plaintiff's pain resulting from his previous spinal surgeries.

Even if the court were to assume that plaintiff's pain as a result of multiple spinal surgeries constituted a serious medical need, there is no evidence of defendants' deliberate indifference to that medical need. Plaintiff's Eighth Amendment claim is based on his assumption that there is a policy against the prescription of any and all narcotic pain medications in the NCJ. He complains that defendant Mahar ordered the detox protocol and that Major Saxton, the Chief Administrative Officer of the NCJ, implemented a policy of no narcotic pain medication. Plaintiff offers no proof to support these factual assumptions. In contrast, the defendants have established that there is no blanket prohibition against the prescription of narcotic medications and that Nurse Mahar initiated the detox protocol upon the order of Nurse Practitioner Aikin.

Plaintiff also complains that he was not seen by Dr. Hohensee until June 28, 2005, 48 days after his arrival at the NCJ. He argues that given his serious medical need, he should have been seen by a physician earlier. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute

17

deliberate indifference." *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001); *see also Chance,* 143 F.3d 698 at 703 ; *McCloud v. Delaney*, 677 F.Supp. 230, 232 (S.D.N.Y.1988) ( "[T]here is no right to the medical treatment of one's choice if the prescribed treatment is based on applicable medical standards."). Additionally, "[m]ere delay in the rendering of medical treatment in and of itself does not rise to the level of a constitutional violation." *Smith v. Montefiore Med. Ctr.-Health Serv. Div.*, 22 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds,* 151 F. Supp. 2d at 311; *see also Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). "To demonstrate a constitutional violation, a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith,* 22 F. Supp. 2d at 280. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds*, 151 F. Supp. 2d at 311; *see also Wandell v. Koenigsmann*, 2000 WL 1036030, *3 (S.D.N.Y. July 27, 2000) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Additionally, plaintiff contends that the medical staff of the NCJ improperly interfered with his treatment by his personal physician by discontinuing his use of oxycontin and oxycodone and placing him on the detox protocol. Plaintiff's assertion that he should have been given narcotic pain medication is likewise a disagreement over the course of treatment. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. Although plaintiff claims that the defendants ignored and

18

overruled the treatment plan in place when he entered NCJ, an inmate is not entitled to the treatment of his choice. *Id.* at 702. Plaintiff's demand for narcotic pain medications and defendants' unwillingness to prescribe them does not create an Eighth Amendment claim. *See Ifill v. Weinstock*, 2012 WL 162405, \*4 (W.D.N.Y. January 19, 2012); *Guarneri v. Wood,* 2011 WL 4592209, at \*13 (N.D.N.Y. September 2, 2011) ("Defendants regularly offered [plaintiff] non-narcotic pain medication . . . . . [Plaintiff]'s complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.").

In this case, plaintiff was seen by a registered nurse on the day of his admission. He was seen by Nurse Practitioner Aikin on May 12, 13, 16, and 19, 2005, June 3 and 14, 2005, October 12, 2005, November 15, 2005, December 16, 2005, and January 6, 2006. He was seen by Dr. Hohensee on June 28, 2005, December 2, and 30, 2005, and January 27, 2005. He received medication, medical advice, diagnostic x-rays, and follow-up care with a physician. Even granting plaintiff the benefit of every favorable inference, it cannot be said that this medical care was inadequate or evinces deliberate indifference on the part of the defendants. Based on the foregoing, no reasonable jury could find that the defendants acted with deliberate indifference to plaintiff's medical needs in violation of his rights under the Eighth and Fourteenth Amendments. Accordingly, defendants are entitled to summary judgment as a matter of law dismissing plaintiff's complaint. The court need not address the argument that the defendants are entitled to qualified immunity.

**CONCLUSION**

The defendants' motions for summary judgment (Items 59, 60) are granted and the complaint is dismissed.  Plaintiff's cross motion for summary judgment (Item 62) is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated: August 1, 2012
p:\opinions\05-868.jul242012